J-S08004-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA
  :
            v.              :
  :
  :
RAYMOND CHARLES WHITE     :
  :
           Appellant      :   No. 478 WDA 2019

Appeal from the PCRA Order Entered March 5, 2019
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0013548-2000

BEFORE:  OLSON, J., McCAFFERY, J., and MUSMANNO, J.

MEMORANDUM BY OLSON, J.:            FILED NOVEMBER 17, 2020

Appellant, Raymond Charles White, appeals from the March 5, 2019 order dismissing his petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546.  We affirm.

This panel previously summarized the procedural history as follows:

The record reveals that on July 16, 2002, a jury found Appellant guilty of third-degree murder and criminal conspiracy to commit third-degree murder.[FN1]  On October 23, 2002, Appellant was sentenced to an aggregate 30 to 60 years' incarceration. Appellant timely appealed, and on August 24, 2004, this Court affirmed Appellant's judgment of sentence.  Commonwealth v. White, 860 A.2d 1137 (Pa. Super. 2004).  Appellant did not seek discretionary review in our Supreme Court.

   [FN1] 18 Pa.C.S.A. §§ 2502(c) and 903(a)(1), respectively.

On January 18, 2006, Appellant filed pro se his first PCRA petition raising claims of, inter alia, ineffective assistance of counsel and government interference.  Counsel was appointed to represent Appellant.  On July 9, 2007, Appellant's counsel filed a Turner-Finley[FN2] no-merit letter and a petition to withdraw.  The PCRA court granted counsel's petition to withdraw and notified

Appellant of its intent to dismiss the PCRA petition pursuant to Pa.R.Crim.P. 907. Appellant filed a pro se response. On August 17, 2007, the PCRA court dismissed Appellant's PCRA petition. This Court affirmed the dismissal, and our Supreme Court denied allowance of an appeal. Commonwealth v. White, 959 A.2d 470 (Pa. Super. 2008), appeal denied, 958 A.2d 1048 (Pa. 2008).

> [FN2] Commonwealth v. Turner, 544 A.2d 927 (Pa. 1988) and Commonwealth v. Finley, 550 A.2d 213 (Pa. Super. 1988) (en banc).

On October 27, 2008, Appellant filed pro se his second PCRA petition raising claims of, inter alia, ineffective assistance of counsel and government interference. Counsel was appointed to represent Appellant and subsequently filed a Turner-Finley no-merit letter. On July 7, 2010, the PCRA court notified Appellant of its intent to dismiss the PCRA petition pursuant to Rule 907. Appellant did not file a response. On October 20, 2010, the PCRA court dismissed Appellant's petition.

On December 21, 2011, Appellant filed pro se his third PCRA petition raising a claim of ineffective assistance of PCRA counsel and alleging he never received notice of the PCRA court's intent to dismiss his second PCRA petition or the order dismissing the same. On March 22, 2012, the PCRA court notified Appellant of its intent to dismiss his third PCRA petition pursuant to Rule 907. Appellant filed pro se a response alleging, inter alia, that PCRA counsel abandoned him. The PCRA court dismissed Appellant's third PCRA petition on April 12, 2012. Appellant filed pro se a notice of appeal on May 2, 2012. This Court reversed the dismissal of Appellant's third PCRA petition and remanded the case with instructions. Commonwealth v. White, 2013 WL 11288929 at *1 (Pa. Super. January 28, 2013) (unpublished memorandum). This Court found, "the PCRA court failed to consider the 'no merit' letter at all, and that notice of the [PCRA court's intent to dismiss and subsequent dismissal order were] given solely to PCRA counsel." Id. (original brackets omitted). On remand, PCRA counsel was instructed to provide Appellant a copy of the no-merit letter. Id. The PCRA court, after an independent review of the record, was to provide Appellant notice of its intent to dismiss pursuant to Rule 907 in order to provide Appellant an opportunity to respond. Id.

On February 13, 2013, PCRA counsel filed a petition to reinstate Appellant's second PCRA petition nunc pro tunc. On November

19, 2013, the PCRA court notified Appellant of its intent to dismiss Appellant's second PCRA petition pursuant to Rule 907.[FN3] Appellant filed pro se a response on February 24, 2014. On February 25, 2014, the PCRA court dismissed Appellant's second PCRA petition but did not grant counsel permission to withdraw. Appellant filed pro se a notice of appeal on March 17, 2014. This Court, finding PCRA counsel was not granted permission to withdraw, was unable to address the merits of Appellant's pro se claims and remanded the case with instructions to determine counsel's status. Commonwealth v. White, 2015 WL 7587158 at *3 (Pa. Super. January 7, 2015) (unpublished memorandum).

> [FN3] The record contains no order specifically reinstating Appellant's second PCRA petition nunc pro tunc. It is apparent from the PCRA court's notice of intent to dismiss, however, that the PCRA court reinstated the second PCRA petition.

On January 20, 2015, the PCRA court granted counsel's petition to withdraw. Having retained jurisdiction, this Court determined that because Appellant perfected his underlying pro se appeal, the PCRA court's subsequent order, upon remand, granting counsel permission to withdraw was a nullity. Commonwealth v. White, 2015 WL 7458884 at *1 (Pa. Super. March 5, 2015) (unpublished memorandum). This Court remanded the case and instructed the PCRA court to conduct a Grazier[FN4] hearing to determine if Appellant waived assistance of counsel. Id.

> [FN4] Commonwealth v. Grazier, 713 A.2d 81 (Pa. 1998).

After conducting a Grazier hearing, the PCRA court determined that Appellant knowingly, intelligently, and voluntarily waived his right to counsel, and granted counsel's petition to withdraw on March 20, 2015. This Court subsequently affirmed the PCRA court's dismissal of Appellant's second PCRA petition. Commonwealth v. White, 2015 WL 7194237 at *5 (Pa. Super. May 12, 2015) (unpublished memorandum).

On August 20, 2018, Appellant filed the instant PCRA petition, his fourth, requesting a new trial based upon after-discovered evidence.[FN5] The PCRA court conducted an evidentiary hearing

on February 7, 2019, and subsequently dismissed Appellant's PCRA petition on March 5, 2019.[1]

> [FN5] Appellant is represented by Assistant Federal Public Defender Kirk J. Henderson, Esq., who was appointed by the United States District Court for the Western District of Pennsylvania upon Appellant's filing of a petition for writ of habeas corpus.

Commonwealth v. White, 2020 WL 2311152 at *1-2 (Pa. Super. May 8, 2020) (unpublished memorandum).

Appellant filed a notice of appeal raising the following issue for our review:

> Did the PCRA court err in finding that [Appellant] is not entitled to a new trial as a result of the after-discovered evidence, namely the testimony of an eyewitness to the shooting who identified two alternate suspects and testified that [Appellant] was not present at the scene at the time of the shooting?

Appellant's Brief at 4.[2]

Upon a prior review of the PCRA court's dismissal of Appellant's fourth PCRA petition, this Court concluded, after reviewing the record, that Appellant pleaded and proved the first three prongs of the after-discovered evidence

_____

[1] The PCRA court found Appellant pled and proved the newly-discovered facts exception to the jurisdictional time-bar, as set forth in 42 Pa.C.S.A. § 9545(b)(1)(ii). PCRA Court Opinion, 8/20/19, at 5. Therefore, Appellant's petition was timely filed, and the PCRA court had jurisdiction to address the merits of Appellant's underlying claim.

[2] Appellant and the PCRA court complied with Pa.R.A.P. 1925.

test.[3]  As to the fourth prong of the after-discovered evidence test, we held that "[t]he PCRA court, however, did not make specific, independent findings of fact and conclusions of law and did not make a definitive determination as to the credibility of the eyewitness."  White, 2020 WL 2311152 at *5. Thereupon, we remanded "the case to the PCRA court for the limited purpose of determining definitively whether it found the eyewitness to be credible and, if so, whether her testimony would likely produce a different verdict in this case if a new trial were granted."  Id. at *6.

On June 30, 2020, the PCRA court filed a supplemental Rule 1925(a) opinion in which the PCRA court definitively determined that the eyewitness was not credible.  PCRA Court Opinion, 6/30/20, at 5.  We now proceed to review whether the record supports the PCRA court's determination that the after-discovered evidence, namely the eyewitness (and her testimony), was

_____

[3] In order for a petitioner to be granted a new trial based upon after-discovered evidence, the petitioner must demonstrate that the after-discovered evidence:

> (1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted.

Commonwealth v. Small, 189 A.3d 961, 972 (Pa. 2018), citing Commonwealth v. Pagan, 950 A.2d 270 (Pa. 2008), cert. denied, 555 U.S. 1198 (2009).

incredible and that Appellant, therefore, failed to satisfy the fourth prong of the after-discovered evidence test.[4]

Proper appellate review of a PCRA court's dismissal of a PCRA petition is limited to the examination of "whether the PCRA court's determination is supported by the record and free of legal error." Commonwealth v. Miller, 102 A.3d 988, 992 (Pa. Super. 2014) (citation omitted). "The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record." Commonwealth v. Lawson, 90 A.3d 1, 4 (Pa. Super. 2014) (citations omitted). "This Court grants great deference to the findings of the PCRA court, and we will not disturb those findings merely because the record could support a contrary holding." Commonwealth v. Hickman, 799 A.2d 136, 140 (Pa. Super. 2002) (citation omitted). In contrast, we review the PCRA court's legal conclusions de novo. Commonwealth v. Henkel, 90 A.3d 16, 20 (Pa. Super. 2014) (en banc), appeal denied, 101 A.3d 785 (Pa. 2014).

To obtain a new trial based on after-discovered evidence, the petitioner must satisfy a four-pronged test requiring, inter alia, that the petitioner demonstrate, by a preponderance of the evidence, that the after-discovered evidence "would likely result in a different verdict if a new trial were granted."

_____

[4] In a July 20, 2020 per curiam order, this Court granted Appellant's petition requesting a supplemental briefing schedule. Appellant and the Commonwealth timely filed supplemental briefs on August 4, 2020, and August 18, 2020, respectively.

Small, 189 A.3d at 972; see also Commonwealth v. Padillas, 997 A.2d 356, 363 (Pa. Super. 2010), appeal denied, 14 A.3d 826 (Pa. 2010). A request for a new trial based on exculpatory eyewitness testimony hinges on the credibility of the testimony. Small, 189 A.3d at 975. Only credible testimony satisfies the fourth prong of the after-discovered evidence test. Id.

In determining whether the after-discovered evidence is of such a nature and character that it would compel a different verdict if a new trial were granted, "a court should consider the integrity of the alleged after-discovered evidence, the motive of those offering the evidence, and the overall strength of the evidence supporting the conviction." Padillas, 997 A.2d at 365 (citations omitted). It is axiomatic that if the after-discovered evidence is incredible, the after-discovered evidence would not compel a different outcome, and as a result, the PCRA court must deny the request for a new trial regardless of whether a petitioner satisfied the first three prongs of the test. Small, 189 A.3d at 977.

Here, the PCRA court, in finding that the eyewitness was not credible, stated,

> [The PCRA] court does not find [the eyewitness] to be a credible witness. [The eyewitness] admitted several times that she was given the names of [two males] by [a friend], who is related to [Appellant]. Given the connection to [Appellant's] family, the fact that [the eyewitness] could not identify the perpetrators until given their names by [Appellant's family], and her unwillingness to be interviewed by [police] detectives, [the PCRA c]ourt expressly and conclusively finds that the witness is incredible.

PCRA Court Opinion, 6/30/20, at 5 (record citation omitted).

Appellant argues that the PCRA court erred in finding the eyewitness incredible because, in the PCRA court's view, she did not know the last names of the two male shooters personally, she received that information from a friend connected to Appellant's family, and because the eyewitness refused to be interviewed by the police prior to testifying at the evidentiary hearing. Appellant's Supplemental Brief at 5-11. Appellant contends that the eyewitness knew the first names of both male shooters and was able to provide a physical description of the men, based upon her own personal knowledge, and that her friend only provided the last names of the two male shooters after the eyewitness spoke with Appellant's legal counsel. Id. at 6-7. Appellant argues that the police, when investigating a case against a suspect, regularly rely on eyewitnesses who only know the alleged perpetrators of the offenses by a nickname, first name, or physical description, and an eyewitness's lack of knowledge surrounding the proper full name of the suspect does not make the eyewitness incredible. Id. at 7. Appellant also contends that the eyewitness in the case sub judice was not obligated to speak with the police or the prosecutor prior to testifying at the evidentiary hearing and that her failure to do so does not make her an incredible witness. Id. at 9. Appellant argues, "[the] lack of trust and confidence in the police causes many, especially those in communities of color, to avoid interactions with the police." Id. at 8 (citation omitted).

On the issue of whether the eyewitness's testimony could result in a different verdict if a new trial were granted, Appellant argues that at a new

trial, the eyewitness would be the only witness "who could identify by name the two [male] shooters[.]" Id. at 12. Appellant contends, "the Commonwealth's case against [Appellant] was both thin and premised on inconsistent testimony and no physical evidence." Id. at 12. The eyewitness's testimony, Appellant asserts, not only corroborates the testimony of Appellant's alibi witnesses, but also identifies, for the jury, two male individuals, neither of whom were Appellant, as the shooters. Id. Appellant submits that "[t]he entire case, both for the Commonwealth and [Appellant], was full of testimony of individuals with questionable motives, and was wanting of a disinterested witness for either side. [The eyewitness is] able to fill that void for the jury." Id. at 14-15.

The Commonwealth argues that the PCRA court's credibility determination is supported by the record because "the full identities of the purported shooters [were] given to [the eyewitness] by a biased source – [Appellant's] wife[ – ]and [the eyewitness] freely spoke to defense investigators but refused to speak to [the] police." Commonwealth's Supplemental Brief at 1. The Commonwealth contends Appellant's "wife again somehow knew exactly who [the eyewitness] saw on the day of the shooting, came up with two last names, and communicated them back to [(the eyewitness's friend)], who transmitted them back to [the eyewitness.]" Id. at 4. The eyewitness is incredible, the Commonwealth asserts, because "[a]t a minimum, the fact remains that [Appellant's] wife is responsible for half of the identification of the purported shooters." Id. at 5 (emphasis in original).

The Commonwealth further argues that the eyewitness's refusal to speak with the police demonstrated that the eyewitness "was not testifying out of a desire to tell the truth or do the right thing" but, rather, "to help one party at the expense of the other." Id. The Commonwealth maintains that because the eyewitness is incredible, her testimony "cannot form the basis for a new trial[.]" Id. at 6.

Here, the PCRA court found the eyewitness incredible because the eyewitness could not identify the two males who allegedly shot the victim until Appellant's wife's aunt conveyed to the eyewitness the names of the two male shooters and because the eyewitness refused a police interview after coming forward with the after-discovered evidence. PCRA Court Opinion, 6/30/20, at 5. At the evidentiary hearing, the eyewitness testified that she was 16 years old at the time she witnessed the shooting. N.T., 2/7/19, at 8. Upon observing the two male shooters, the eyewitness knew their first names from seeing them around the neighborhood and because a friend of the eyewitness dated one of the alleged shooters. Id. at 11, 24. The eyewitness stated that the two male shooters were approximately the same age as the eyewitness, and the eyewitness was able to provide a physical description of the two males. Id. at 15, 24. The eyewitness stated she did not disclose her observations of the shooting at the time it occurred because she was scared and because she did not want her mother to know what she was doing that afternoon. Id. at 12-13, 16.

Several years later, the eyewitness met and became friends with Appellant's wife's aunt, who knew the eyewitness's children because the friend's mother used to babysit the children. Id. at 13. In the course of the friendship, the eyewitness confided in the friend about the shooting she witnessed. Id. The friend recognized the details of the shooting because she was familiar with the area and because her niece was married to Appellant. Id. at 35-36. The friend testified that after speaking with her niece, she provided the eyewitness with the name of Appellant's counsel and told the eyewitness, "if it came to her heart, that if she felt like she could get the courage to speak up, that she could help because [Appellant has] been in jail a long time." Id. at 37.

The eyewitness subsequently spoke with an investigator for the Federal Public Defender's Office who asked the eyewitness if she could obtain the last names of the two males she observed as the shooters. Id. at 19. The eyewitness inquired with her friend about the last names, and her friend got the last names from Appellant's wife. Id. at 19, 37.

After disclosing the names of the two male shooters to the Federal Public Defender's Office, the eyewitness was contacted by the Pittsburgh Police Department several times.[5] Id. at 20, 50. The eyewitness did not speak with

_____

[5] Detective Brandon Nee, with the City of Pittsburgh Police Homicide Unit, testified that the police visited the eyewitness's home in an attempt to speak with her and made several telephone calls. N.T., 2/7/19, at 50-51. The eyewitness stated that the police left a card with contact information at her residence and left several telephone messages for her. Id. at 20.

the police because at the time of her disclosure of the after-discovered evidence to the Federal Public Defender's Office, she was not informed that the police would want to speak with her. Id. at 20.

Based upon our review of the record, we do not find, as a matter of law, that the eyewitness was incredible because she was unable to provide the full names of the two male shooters. The eyewitness was able to provide the investigator from the Federal Public Defender's Office the first names and physical descriptions of the two male shooters, based upon personal knowledge. Only after the investigator prompted the eyewitness to learn the last names of the two male shooters did the eyewitness enlist the aid of her friend. It is axiomatic that the courts, the Commonwealth, and defendants regularly rely on the testimony of witnesses who observe criminal activity but are able only to identify a suspect by first name, last name, nickname, street-name, or a description in order to prove the elements of a criminal offense or a defense to criminal charges. See Commonwealth v. Shepherd, 409 A.2d 894, 897 (Pa. Super. 1979) (holding that use of nickname information to determine the defendant's full name was permissible for purposes of establishing probable cause in support of defendant's arrest); see also Commonwealth v. Williams, 58 A.3d 796, 800 (Pa. Super. 2012) (stating that disclosure of the defendant's nickname was relevant and, therefore, not overly prejudicial when disclosed to the jury, because the witness, who implicated the defendant in the victim's murder, only knew the defendant by his nickname), appeal denied, 68 A.3d 908 (Pa. 2013). Here,

the eyewitness knew the first names of the two male shooters and was able to provide a physical description. The eyewitness did not inquire about, or learn of, the last names of the two shooters until asked to do so by the Federal Public Defender's Office in the course of its investigation. The eyewitness's inability to immediately provide the last names of the two male shooters does not, alone, make her an incredible witness.

Furthermore, we do not conclude, as a matter of law, that the eyewitness lacked credibility simply because she refused to speak to the police after coming forward with the after-discovered evidence. See Commonwealth v. Rodriguez, 174 A.3d 1130, 1140-1141 (Pa. Super. 2017) (finding that the eyewitness's admitted reluctance to inform the police of what he observed because he did not like to cooperate with the police did not prevent the jury from finding the eyewitness's testimony to be credible), appeal denied, 186 A.3d 941 (Pa. 2018); see also Commonwealth v. Molan, 465 A.2d 676, 678 (Pa. Super. 1983) (stating that a witness for the prosecution is not required to speak with defense counsel prior to trial); Commonwealth v. Fletcher, 750 A.2d 261, 272 (Pa. 2000) (stating that a defense witness is not required to speak with the prosecution prior to trial), abrogated on other grounds by, Commonwealth v. Freeman, 827 A.2d 385 (Pa. 2003).

The eyewitness in the instant case was 16 years old when she witnessed the shooting of the victim in 2000, a fact that she kept secret until disclosing the information surrounding the event to a friend sometime in late January or

early February 2018. N.T., 2/7/19, at 12-13. The eyewitness did not speak to the police about the shooting because she was "scared of somebody knowing who [she] was. [She] was scared of some act of violence happening to [her] or [her mother]." Id. at 16. In describing the impact that witnessing the shooting had on her life, the eyewitness stated,

> I don't go out. I have -- I shut myself in. I have seven children. I'm very overprotective of them. I keep them sheltered. I keep them in the house. I just don't feel like I've lived the life that I should have because of that.

Id. at 12-13. The eyewitness stated that she felt comfortable, now, disclosing the names of the two male shooters because she learned that both males were deceased. Id. at 17.

After the eyewitness disclosed the after-discovered evidence to the Federal Public Defender's Office, the Pittsburgh Police Homicide Unit attempted several times to contact the eyewitness. The eyewitness, much like any witness in a case who is not subject to court order, was not obligated to speak with the police prior to the evidentiary hearing, and the eyewitness's failure to speak with the police, alone, does not compel a finding that she lacked credibility. Therefore, we discern that the PCRA court abused its discretion and erred as a matter of law in expressly and conclusively finding the eyewitness was not credible.

This error, however, does not necessitate a new trial unless Appellant demonstrated, by a preponderance of the evidence, that the eyewitness testimony would likely result in a different verdict. Our Supreme Court defined

"preponderance of the evidence" as "'a more likely than not inquiry,' supported by the greater weight of the evidence; something a reasonable person would accept as sufficient to support a decision." Commonwealth v. Batts, 163 A.3d 410, 474 (Pa. 2017) (citation and some original quotation marks omitted).

> When evaluating whether a petitioner [] established by a preponderance of the evidence that the after-discovered evidence would likely produce a different verdict, a court must examine the persuasiveness of the new evidence[,] assuming the fact-finder believes it. This inquiry includes evaluations of (1) the nature of the new evidence; (2) whether, and to what extent, the new evidence is consistent[,] or inconsistent[,] with other trial testimony; and (3) whether, and to what extent, the new evidence is consistent[,] or inconsistent[,] with documentary evidence.

Commonwealth v. Payne, 210 A.3d 299, 302 (Pa. Super. 2019) (citations omitted), appeal denied, 218 A.3d 1201 (Pa. 2019). Where the after-discovered evidence does not undermine the Commonwealth's theory of guilt which it presented at the original trial, or make it more difficult for the Commonwealth to argue that theory at a new trial, in light of the after-discovered evidence, then the after-discovered evidence is unlikely to result in a different outcome. Payne, 210 A.3d at 302, relying on Commonwealth v. Bulted, 279 A.2d 158 (Pa. 1971). Typically, after-discovered evidence "that only undermines the credibility of witness testimony will not justify a new trial because such after-discovered evidence would not be of the nature and character to change the outcome at a new

trial." Small, 189 A.3d at 976 n.12, citing Commonwealth v. Choice, 830 A.2d 1005 (Pa. Super 2003) (Klein, J. dissenting).

Here, a review of the record demonstrates that the Commonwealth offered the testimony of City of Pittsburgh Police Homicide Detective Richard McDonald ("Detective McDonald"). Detective McDonald stated that Appellant initially admitted to being present at the shooting but denied shooting the victim. N.T., 7/19/02 (morning session), at 65-66, 73. Appellant identified a second male, by the nickname "Pooter," as the shooter responsible for the victim's death. Id. Appellant explained to Detective McDonald that the events that led to the shooting death of the victim stemmed from an incident that occurred on the prior day, involving, inter alia, Appellant, Pooter, and James Thomas, who Appellant identified as "J.T." Id. at 73. During questioning by Detective McDonald, Appellant subsequently confessed that he shot the victim, dismantled the gun, and disposed of the gun parts throughout the surrounding community. Id. at 75-78; see also N.T., 7/19/02 (afternoon session), at 13, 32-48; N.T., 7/22/02, at 408-412[6]. Officer McDonald took notes of Appellant's statement describing his involvement in the shooting.

_____

[6] A clerical error is apparent in the notes of testimony marked as "July 16, 2002 through July 23, 2002 (July 19, 2002, see separate transcripts)". Page 220 and page 405 of the notes of testimony each identify the testimony that follows as occurring on July 18, 2002. A review of the notes of testimony demonstrates that the testimony beginning on page 220 occurred on July 18, 2002, and the testimony beginning on page 405 occurred on July 22, 2002.

N.T., 7/22/02, at 408-412.  Upon memorializing Appellant's confession in his

notes,[7] Officer McDonald asked Appellant to review the notes, make any

_____

[7] Based upon Detective McDonald's testimony in which he read and explained his notes, Appellant's confession was memorialized as follows:

> Interview of Raymond Charles White.  Black male.  19 years old. Date of birth, [June 17, 1981]. It all started the day before the murder.  [Did not] know the kid that got shot.  [Was not] after him.  Was after J.T.  The day before driving down Hermitage [Street] in my red Pontiac 600 with Pooter [(Anthony Boyd)].  Not going anywhere in particular.  Just driving around.  Pooter said [he] saw J.T. and a group of other guys.  [A]s we were driving by, J.T. was shooting at the car, spun [the car] back around. J.T. - dude ran towards [North Lang Avenue].  Drove to [North Lang Avenue].  J.T. saw the car again.  [Shot at car while we were driving between Hermitage Street, between Monticello Street and North Homewood Avenue.  First time they shot before running to [North Lang Avenue].]  Drove to Mt. Vernon [Street].  Got out of the car.  I had a 9 millimeter [handgun] on this day.  Pooter had a 48 [sic] semi[-]automatic handgun.  While walking over to [North Lang Avenue], saw J.T. and the other dudes with him in a car.  Shot--we (Pooter and me) shot at the car and then drove off. Next day, middle of the day, we were going over to Pooter's girlfriend, Christina's house[.]  Hanging out there.  Had guns with us.  On this day, I had the 45-caliber black [semi-automatic handgun,] make and model unknown.  [The handgun is] an Army issue 45 caliber.  Pooter had the 9 millimeter [handgun].  Believes it was a Smith and Wesson.  Walked back to Hermitage [Street]. Talked about going up to Lincoln [Avenue] to get J.T.  [[G]oing up to Lincoln [Avenue] to shoot J.T. because he shot at us the day before.  Didn't know dude on bike.  Shot at him.  When he spotted us coming out of alley onto Laxton [Street], shot at him until he was out of my sight.  Pooter shot at J.T. and the other dude.]  With the guns, walked from Hermitage Street to Lincoln [Avenue]. Once over at Lincoln [Avenue], walked down the alley.  As [we] walked down alley, saw dude on bike.  [[N]o one, J.T. or the others, ever shot back at us.  Me and Pooter, were the only ones shooting.  [Do not] want to go on tape.  This is good enough.  The guns were usually on our persons.  We shared guns or we stashed

necessary corrections, and initial any corrections made, because Appellant refused to submit to an audio recording of his confession.[8]  Id. at 413-414; see also N.T., 7/19/02 (morning session), at 78-79.

To refute the veracity of his confession, Appellant, at trial, inter alia, presented evidence showing that the gun Appellant used to shoot the victim (which, according to Appellant's confession, was dismantled and scattered throughout the community) was later discovered intact and used by another

_____

> them[.]  [Will not] tell where.  Shot at dude on the bike, about five times.  Started running.  Stopped.  Shot at house.  J.T., other dudes, ran in.  They never shot back.  Ran to Hermitage [S]treet.  Fired eight shots.  Gun held seven in clip, one in chamber (7 and 1).]  Saw the dude on bike, riding on Laxton [Street].  Still continued to walk down the alley.  [On] Tennis [Way, the victim] rode [his bike] back to Laxton [Street] where couple [of] other dudes and J.T., light-skinned dude[,] were.  Once [we] got to Laxton [Street], up from where we were near the alley [the victim] on [the] bike saw us.  And as we got on Laxton [Street].  Had guns in our hands.  Pulled guns.  45 caliber.  Started shooting [at the victim while he rode his bike].  He drove off on bike from Laxton [Street] onto Atwell [Street].  Pooter shot at J.T. and other dudes[.]  Still continues to shoot.  Ran back down Tennis [Way].  Stopped near other side of house.  Still shooting.  I fired total of about eight shots.  Ran down alley, back to Hermitage Street.  Dismantled guns and spread parts throughout Homewood.  [Will not] tell where.  [They are] just gone.  [R]ed Pontiac is owned by a sister[.  Do not ] know the plate number.

N.T., 9/22/19, at 408-412 (Appellant's corrections of Detective McDonald's notes appear in italics).

[8] Detective McDonald stated that after Appellant confessed to shooting the victim, Detective McDonald asked Appellant to repeat his confession to another detective.  N.T., 7/19/02 (morning session), at 82.  The other detective did not testify at Appellant's trial.

suspect in a separate, unrelated criminal act that occurred while Appellant was incarcerated pending trial in the instant case. N.T., 7/19/02 (afternoon session), at 38-40; see also N.T., 7/19/02 (morning session), at 79.

Appellant also relied upon the recantation testimony of James Thomas ("Thomas"). At trial, the Commonwealth offered Thomas as a witness against Appellant because Thomas initially told the police that he observed Appellant shoot the victim. When called to testify at trial, however, Thomas recanted his earlier statement to the police and said he lied to the police when he previously identified Appellant as the shooter. Thomas explained that he falsely identified Appellant as the perpetrator because Appellant owed him money.[9] N.T., 7/18/02, at 256, 265-266, 282-284, 289. Although Thomas stated that Appellant was not the shooter, Thomas was not able to identify the perpetrator. Id. at 289.

In his defense, Appellant presented the testimony of two alibi witnesses at trial. One of Appellant's alibi witnesses was his then-girlfriend and the other was a friend of Appellant. Both alibi witnesses testified that on the day and time of the shooting, Appellant and "Pooter" were with them having dinner and watching a movie. N.T., 7/22/02, at 438-442, 477-479, 481. According to these witnesses, Appellant was not present at the scene of the shooting

_____

[9] In exchange for cooperating with the Commonwealth as a witness against Appellant, Thomas received immunity from prosecution for any crimes stemming from his testimony. Initially, Thomas refused to testify and was held in contempt of court. Subsequently, however, he testified, whereupon he recanted his prior identification of Appellant as the shooter.

and, therefore, could not have been the shooter. Gary Stevenson, Thomas's brother, also testified that he observed one of the shooters, who was unknown to him. Id. at 507-510. Stevenson provided a description of the shooter, which did not match Appellant's physical appearance. Id. According to Stevenson, Appellant was not the individual he observed. Id. at 508. Stevenson admitted, however, that he observed a possible second shooter but he could not definitively state whether that person was someone other than Appellant. Id. at 511-513.

Here, the identity of the shooter was the focal point of Appellant's trial. The Commonwealth argued that Appellant's confession and Thomas's initial identification of Appellant as the shooter proved Appellant's guilt. Appellant proffered the testimony of two alibi witnesses, together with Stevenson's testimony, to establish that the shooter was someone other than himself. Furthermore, Appellant portrayed his confession as incredible due to the circumstances under which it was obtained (and subsequently memorialized) and because the confession contained inaccuracies relating to the dismantling of the gun used to shoot the victim. Presented with all of this evidence, the jury, as fact-finder, convicted Appellant of the aforementioned crimes after, inter alia, crediting Appellant's confession and Thomas's original identification of Appellant as the shooter and correspondingly disregarding the alibi witness

testimony and Stevenson's identification of the shooter as someone other than Appellant.[10]

We are unable to agree with Appellant's argument that he has shown, by a preponderance of the evidence, that the after-discovered evidence in the form of eyewitness testimony would likely result in a different verdict if a new trial were granted. Notwithstanding that an element of Appellant's confession, namely the dismantling of the gun, was proven inaccurate at trial, the veracity and integrity of the inculpatory content of the confession was otherwise fully tested by Appellant's counsel during the lengthy cross-examination of Officer McDonald. The confession provided a detailed account of the events that occurred on the day prior to the shooting and of the circumstances surrounding the shooting death of the victim. Appellant's recollection of these events, as detailed in his confession, was supported by additional witness testimony. Rather than denying that he was present at the scene of the shooting, when questioned by Officer McDonald, Appellant initially claimed he was present at the scene of the shooting but that he did not shoot the victim. Appellant, however, later confessed to Officer McDonald that he was the shooter.

_____

[10] Although the evidence against Appellant was circumstantial, comprised mainly of Officer McDonald's notes memorializing Appellant's confession and Thomas's initial identification of Appellant as the shooter (later recanted at trial), the jury found Appellant guilty of the aforementioned crimes despite the absence of eyewitness testimony linking him to the shooting and lack of physical evidence such as Appellant's fingerprints on shell casings recovered at the scene or on the gun, which was later discovered intact.

Here, the after-discovered evidence, namely the eyewitness's identification of the two male shooters, neither of whom were Appellant, goes to the very heart of Appellant's defense theory. While the proffered testimony of the eyewitness amplifies Appellant's claim that he was not the shooter, the after-discovered evidence does not present a distinctly different theory of defense. If a new trial were granted, the Commonwealth's evidence would still include, inter alia, Appellant's confession and Thomas's initial identification of Appellant as the shooter, and the Commonwealth could still argue that Appellant, based upon this evidence, was the shooter. The after-discovered evidence would do little more to refute the Commonwealth's position than the evidence presented by Appellant at his original trial, namely the testimony of the alibi witnesses and Stevenson, as well as Thomas's recantation. Given the eyewitness's connection to Appellant's family and the fact that the two individuals identified by the eyewitness are now deceased, we are not persuaded that the added specificity of naming the two male shooters makes Appellant's defense theory more believable, or more likely to produce a different outcome, than the evidence presented at Appellant's original trial.

In considering the overall strength of the evidence presented against Appellant, as well as the integrity of the eyewitness and the motive for her testimony, we hold, based upon a preponderance of the evidence, that the after-discovered evidence would not likely result in a different verdict. Consequently, the PCRA court did not error in denying Appellant's PCRA petition.

Order affirmed.

Judge Musmanno joins.

Judge McCaffery concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/17/2020